**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| T-M VACUUM PRODUCTS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-4108 |
| | § | |
| TAISC, INC., d/b/a GLOBALEASE | § | |
| SOLUTIONS, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This lawsuit arises from a three-party transaction for the sale and lease of two commercial furnaces. The furnaces were manufactured by T-M Vacuum Products, Inc., a New Jersey corporation; financed by TAISC, Inc., d/b/a GlobaLease Solutions, a Texas corporation; and leased to Ulba Mettalurgical Plant Joint Stock Company, a company located in Kazakhstan. When Ulba makes all of the lease payments, it will own the furnaces.

GlobaLease paid T-M part of the purchase price before T-M delivered the furnaces to Ulba in Kazakhstan. T-M and Ulba later agreed in writing to extend the delivery dates. T-M delivered the furnaces within the extended deadlines. Ulba made the lease payments to GlobaLease on the original schedule. GlobaLease did not pay T-M the balance of the purchase price. T-M sues GlobaLease for the unpaid balance. GlobaLease has counterclaimed, alleging that because T-M was late in delivering the furnaces, not only is no

money owed, but the parties' contract requires T-M to refund the amount GlobaLease paid before delivery because of the delay.

T-M filed a summary judgment motion, (Docket Entry No. 8), to which GlobaLease responded, (Docket Entry No. 10).  T-M also applied for a writ of garnishment, (Docket Entry No. 24), to which GlobaLease responded, (Docket Entry No. 28), and T-M replied, (Docket Entry No. 29).  This court held a hearing on the garnishment application, at which counsel presented argument.

Based on the pleadings, the motions, responses and reply, the parties' submissions, the arguments of counsel, and the applicable law, this court grants T-M's motion for summary judgment, finding that based on the undisputed evidence, T-M is entitled to recover the balance of the purchase price for the two furnaces as well as prejudgment interest and reasonable attorneys' fees.  GlobaLease is not entitled to an offset for the conditional payments.  This court denies the application for a writ of garnishment on the present record based on lack of personal jurisdiction over the garnishees.  The reasons for these rulings are set out in detail below.

## I.    Background

### A.    The Purchase and Delivery of the Furnaces

On October 25, 2005, T-M, Ulba, and GlobaLease entered into Cross Border Equipment Lease Agreement No. 05-465402.  (Docket Entry No. 1, Ex. B).  This Lease Agreement provided that GlobaLease (the "Lessor") would purchase two furnaces (the "Equipment") from T-M (the "Supplier").  T-M would "transfer the ownership of the

2

Equipment" to GlobaLease and "transfer temporary possession of the Equipment directly to" Ulba (the "Lessee"). GlobaLease would lease the furnaces to Ulba, which would acquire ownership when it made all the lease payments to GlobaLease. (*Id.*, Ex. B at 2).

The Lease Agreement stated:

> Lessee [Ulba] has selected supplier [T-M], authorized Lessor [GlobaLease] to make payments to supplier, and further agrees that the equipment is in all ways acceptable to Lessee. Lessee and Supplier Agree and affirm that any and all issues relating to the Equipment, Equipment condition, and/or Equipment delivery are issues solely between Lessee and Supplier and any such issues shall have no effect on Lessee's payment obligations to Lessor nor allow Lessee to delay, suspend, or reduce any payments due from Lessee to Lessor.

(*Id.*, Ex. B at 6).

On October 28, 2005, T-M and Ulba also entered into Purchase Contract No. 31-09-05/1176. (Docket Entry No. 1, Ex. A). The Purchase Contract stated that payment of the $3,160,017 price for the two furnaces "shall be made in accordance with the leasing agreement No. 05-465402 dated 27 October 2005."[1] (*Id.*, Ex. A at 1). The Purchase Contract required shipment of one furnace within 32 weeks and the other within 36 weeks of the Purchase Contract date. (*Id.*, Ex. A at 2). The Purchase Contract stated that Ulba could "cancel this Contract entirely or partially by sending to the Supplier a written notification of nonperformance of obligations" if T-M failed to deliver the furnaces "in time stipulated in the Contract, or within the period of the Contract extension rendered by [Ulba]." (*Id.*, Ex. A at 8).

---

[1]The date of the Lease Agreement submitted to the court is October 25, 2005, not October 27, 2005, but it is clear from the Lease Agreement number that the October 25, 2005 Lease Agreement submitted to the court is the same Agreement referred to in the Purchase Contract.

On October 29, 2005, GlobaLease and T-M signed a Consent and Agreement under which GlobaLease agreed to assume Ulba's rights and payment obligations under the Purchase Contract, subject to certain conditions.  (Docket Entry No. 1, Ex. C).  GlobaLease would make "conditional payments" to T-M before it delivered the furnaces to Ulba.  The Consent and Agreement stated that "[i]n the event of Vendor default under the terms of the Purchase Agreement or hereunder, it is expressly agreed and understood that Vendor shall immediately repay upon demand all previously received Conditional Payments to Lessor if such a default continues uncured for a period of more than fifteen days.  Such repayment shall be with interest calculated at one percent per month from the date each Conditional Payment was delivered to Vendor as if such Conditional Payments were originally a loan to Vendor."  (Docket Entry No. 1, Ex. C at 3–4).  Both the Lease Agreement and the Consent and Agreement contained a choice-of-law provision stating that Texas law applied.  (Docket Entry No. 1, Ex B at 7, Ex. C at 4).

Beginning in March 2006, GlobaLease made conditional payments to T-M for the furnaces.  GlobaLease paid $932,158.50 on March 1, 2006 and $310,719.50 on March 7 and on March 16.  (Docket Entry No. 10, Ex. B-2).  On April 28, 2006, GlobaLease sent T-M a letter expressing concern about a proposal to delay delivering the furnaces:

> We are extremely concerned about the situation that has developed relating to the timely delivery of furnaces to Ulba.  Ulba has sent correspondence to us indicating that TM Vacuum Products, Inc. is proposing a very significant delay in production and shipment of the furnaces. . . . [S]uch a delay is viewed as a vendor/supplier default which triggers certain events including under Section 9 of the Consent and Agreement which requires the repayment of all previous Conditional Payments to us with interest.  Understand, it is very important that

> TM respect the terms of the Purchase Contract and make a timely delivery of the furnaces to Ulba.  This situation must be resolved immediately, Ulba reassured, and the furnaces timely produced and shipped in accordance with the purchase contract.

(Docket Entry No. 10, Ex. B-9).

GlobaLease continued to make conditional payments to T-M.  GlobaLease paid $310,719.50 on May 17, June 21, and August 18, 2006.  GlobaLease made a total of $2,485,756 in conditional payments through August 2006.  (Docket Entry No. 10, Ex. B-2).

On November 7, 2006, Ulba sent T-M a letter stating that the delivery date for the furnaces had expired without delivery.  (*Id.*, Ex. B-3).  On November 8, 2006, GlobaLease wrote to T-M asserting a default under the Consent and Agreement terms:

> According to correspondence received from Ulba dated November 7, 2006, you and TM Vacuum Products, Inc. ("TM") have failed to timely deliver two (2) vacuum furnaces and other equipment (the "Units") pursuant to that certain contract dated on or about October 28, 2005 by and between TM and Ulba and are; therefore, in default with such default having continued uncured for a period of more than fifteen (15) days. . . . [T]his letter is our written demand that TM, on or before November 15, 2006, either: (a) provide clear documentary evidence demonstrating TM is not now in default of its obligations and such default has not continued uncured for a period of more than fifteen (15) days; **OR**, (b) immediately return all Conditional Payments we have remitted to TM along with accrued interest.

(Docket Entry No. 10, Ex. B-1).  The record does not show a response to this letter.

T-M shipped the first furnace to Ulba on December 20, 2006, six months after the shipping date set out in the Purchase Contract.  (Docket Entry No. 1, Ex. D at 1).  Ulba accepted the furnace.  (Docket Entry No. 15, Ex. B).  In a written agreement dated May 22, 2007, T-M and Ulba extended the shipping dates for the two furnaces.  Supplementary

5

Agreement No. 3 to the Purchase Contract stated that the first furnace was to be shipped by December 26, 2006 and the second by June 18, 2007.  (Docket Entry No. 1, Ex. A at 42). GlobaLease did not sign Supplementary Agreement No. 3 extending the shipping dates, but GlobaLease had assumed Ulba's rights and obligations under the Purchase Contract.  (Docket Entry No. 10, Ex. A at 4).  T-M shipped the second furnace on June 18, 2007, eleven months after the date called for by the original Purchase Contract but before the due date set in Supplementary Agreement No. 3.  (Docket Entry No. 1, Ex. D at 2).  Ulba tested and accepted the second furnace.  (Docket Entry No. 15, Ex. B).

Despite the late deliveries, Ulba made timely lease payments to GlobaLease.  (Docket Entry No. 8, Ex. A at 2).  Ulba made the first lease payment of $518,901.57 within 40 days of the signing of the Lease Agreement and made five lease payments of $376,243.81 each between April 2006 and October 2007.  The due dates for the three final $376,243.81 lease payments are April 30, 2008, October 30, 2008, and April 30, 2009.  (Docket Entry No. 1, Ex. B at 33).  GlobaLease has not, however, paid T-M the purchase price balance of $621,439.

T-M seeks summary judgment that GlobaLease is liable for the purchase price balance.  In support of its summary judgment motion, T-M submitted an affidavit by its president, Fred T. Stuffer.  The affidavit explains that T-M was unable to manufacture and deliver the two furnaces by the delivery dates stated in the Purchase Agreement because a shortage in a raw material, tungsten, caused a subcontractor to delay in delivering parts. (Docket Entry No. 8, Ex. A).  GlobaLease responds that it does not owe the balance of the

purchase price and that T-M is obligated to return the conditional payments because the late delivery was a default under the agreements. (Docket Entry No. 10 at 2–3). In sum, GlobaLease asserts that despite T-M's delivery of the furnaces, Ulba's acceptance, and Ulba's timely payments to GlobaLease, T-M should be paid nothing.

### B. The Evidence as to the Financing for the Lease Payments

T-M initially applied for a writ of garnishment against Ulba for the lease payments, then filed an amended application against both Ulba and Kazkommersbank, a banking corporation organized under the laws of Kazakhstan. The amendment came after GlobaLease responded to the initial application and informed T-M that Kazkommersbank, not Ulba, was responsible for making the lease payments for the furnaces. GlobaLease has submitted documents showing that Ulba had purchased a letter of credit from Kazkommersbank to fund the lease of the furnaces. On December 6, 2005, Kazkommersbank issued letter of credit No. STE559347, I/B ref ILC002066 for the lease payments to GlobaLease. GlobaLease assigned the letter of credit to Wells Fargo HSBC Trade Bank, N.A., located in Houston. The assignment documents are signed but not dated. (Docket Entry No. 24, Ex. A). Wells Fargo HSBC Trade Bank assigned the letter of credit to what GlobaLease asserts is a Chinese bank. (Docket Entry No. 28, Ex. B). GlobaLease has submitted an electronic "swift message" sent by Kazkommersbank, dated December 27, 2005, confirming and consenting to "both assignments of proceeds as noted in your swift - the beneficiary's assignment of USD 2,257,462.86 to Wells Fargo HSBC Trade Bank, and the subsequent assignment of the same amount by Wells Fargo HSBC Trade Bank to HSBC

Bank PLC." (Docket Entry No. 28, Ex. E). The message does not state the location of HSBC Bank PLC.

## II.    T-M's Motion for Summary Judgment

### A.    The Legal Standards

#### 1.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports the essential element or claim. *Celotex*, 477 U.S. at 330. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary  judgment must be denied,

8

regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. Exxon Mobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the pleading allegations. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### 2. Contract Interpretation

What a contract means, and whether a contract is ambiguous, are questions of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). If the contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and a court should construe the contract as a matter of law. *SAS Inst., Inc. v.*

*Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).  Unambiguous contracts are enforced as written.  *Heritage*, 939 S.W.2d at 121. A court should construe an unambiguous contract according to the plain meaning of its express wording,  *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985), but at the same time "should construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and need not embrace strained rules of interpretation which would avoid ambiguity at all costs,"  *Reilly v. Rangers Mgmt, Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) (citing *Neece v. A.A.A. Realty Co.*, 322 S.W.2d 597, 602 (1959)).   A court should "avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive," and should "not declare a forfeiture unless . . . compelled to do so by language which can be construed in no other way." *Id.* (citing *Hicks v. Smith*, 330 S.W.2d 641, 646 (Tex. Civ. App.–Forth Worth 1959, writ ref'd n.r.e.); *Auto. Ins. Co. v. Teague*, 37 S.W.2d 151, 153 (Tex. Comm'n App. 1931, judgmt. adopted)).

A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation.  *Heritage*, 939 S.W.2d at 121.  A court determines whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when the parties entered the contract.  *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003).  Parol evidence is not admissible for the purpose of creating an ambiguity. *See Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951); *Lewis v. E. Tex. Fin. Co.*, 146 S.W.2d 977, 980 (1941).  The general rule for construing separate instruments or contracts together is that

those executed at the same time, for the same purpose, and in the course of the same transaction, may be considered as one instrument and read and construed together. *Jones v. Kelley,* 614 S.W.2d 95, 98 (Tex. 1981). However, even if the parties executed the instruments at different times, those instruments pertaining to the same transaction may be read together to ascertain the parties' intent. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 840 (Tex. 2000); *Vinson v. Brown,* 80 S.W.3d 221, 231 (Tex. App.–Austin 2002).

### B.    Analysis

GlobaLease asserts that it does not owe the balance of the purchase price for the furnaces and that T-M is obligated to return the conditional payments because T-M defaulted under the terms of agreements. (Docket Entry No. 10 at 2–3). T-M argues that the term "default" should be construed to mean a complete failure to deliver the furnaces, not the "lesser" breach of a delay in delivery. (Docket Entry No. 8 at 4–5).

Neither the Purchase Agreement nor the Consent and Agreement defines the term "default." A default is "[t]he omission or failure to perform a legal or contractual duty." BLACK'S LAW DICTIONARY 449 (8th ed. 2004). "The plain meaning of the term includes breach." *Bradford Partners II, L.P. v. Fahning,* 231 S.W.3d 513, 520 (Tex. App.–Dallas 2007, no pet.) (citing *Alaniz v. Yates Ford, Inc.*, 790 S.W.2d 38, 40 (Tex. App.–San Antonio 1990, no writ) ("[T]he term "default" can mean "omission," "failure," or even "breach" in everyday usage.")). But even if "default" is not limited to a complete failure to perform, this does not mean that T-M forfeits the entire purchase price, as GlobaLease urges.

11

T-M and Ulba agreed, in writing, to extend the delivery dates for the furnaces.  T-M delivered the furnaces within the extended delivery dates and Ulba accepted both furnaces. When a contract provides that "time is of the essence," performance must occur within the specified time in order to entitle the party to specific performance, but a "time is of the essence" provision may be waived and the dates modified.  *Colvin v. Rickert,* No. 04-05-00165-CV, 2006 WL 285993, at *6 (Tex. App.–San Antonio Feb. 8, 2006, pet. denied).  Although GlobaLease argues that it did not agree to the written modification executed by Ulba and T-M, the Lease Agreement provided that "any and all issues relating to the Equipment, Equipment condition, and/or Equipment delivery are issues solely between Lessee and Supplier and any such issues shall have no effect on Lessee's payment obligations to Lessor nor allow Lessee to delay, suspend, or reduce any payments due from Lessee to Lessor."  (Docket Entry No. 1, Ex. B at 6).  Consistent with this language, Ulba continued to make the lease payments to GlobaLease as originally scheduled even after it agreed with T-M to extend the delivery dates.

T-M notified Ulba of the likely delay in the furnace delivery dates in the spring of 2006.  Even after that, GlobaLease continued to make conditional payments to T-M, Ulba continued to make lease payments to GlobaLease, and T-M continued to work to manufacture the furnaces.  The first furnace delivery occurred at the end of December 2006, approximately six months after the originally scheduled delivery date.  T-M and Ulba executed the written agreement to extend the delivery dates. Supplementary Agreement No. 3 specified December 26, 2006 as the first delivery date and June 18, 2007 as the second

delivery date.  Both furnace deliveries were timely under the dates set out in Supplementary Agreement No. 3.

In November 2006, after the originally scheduled delivery date and before the December 2006 extended delivery date, GlobaLease sent T-M a letter demanding "that TM, on or before November 15, 2006, either: (a) provide clear documentary evidence demonstrating TM is not now in default of its obligations and such default has not continued uncured for a period of more than fifteen (15) days; **OR**, (b) immediately return all Conditional Payments we have remitted to TM along with accrued interest."  This letter was sent pursuant to the Consent and Agreement, which stated that "[i]n the event of Vendor default under the terms of the Purchase Agreement or hereunder, it is expressly agreed and understood that Vendor shall immediately repay upon demand all previously received Conditional Payments to Lessor if such a default continues uncured for a period of more than fifteen days.  Such repayment shall be with interest calculated at one percent per month from the date each Conditional Payment was delivered to Vendor as if such Conditional Payments were originally a loan to Vendor."  (Docket Entry No. 1, Ex. C at 3–4).  The delay in the furnace deliveries was not "cured" within fifteen days.  But T-M and Ulba agreed that T-M's delay in delivery was not a default when Ulba accepted the December 2006 delivery of the first furnace and when Ulba and T-M executed Supplementary Agreement No. 3.

T-M's delay in delivery would have permitted GlobaLease or Ulba to cancel the contracts.  The Purchase Contract stated that Ulba could "cancel this Contract entirely or partially by sending to the Supplier a written notification of nonperformance of obligations"

13

if T-M failed to deliver the furnaces "in time stipulated in the Contract, or within the period of the Contract extension rendered by [Ulba]." (Docket Entry No. 1, Ex. A at 8). Neither Ulba nor GlobaLease canceled the contract for the delivery of the furnaces before the deliveries. Ulba agreed to late delivery. T-M performed under the Supplementary Agreement by delivering the furnaces "within the period of the Contract extension." Ulba made the lease payments to GlobaLease under the timetable originally set, without delay, and GlobaLease accepted the payments. T-M's delay did not excuse GlobaLease's performance because GlobaLease and Ulba treated the contracts as continuing and both T-M and Ulba performed. T-M delivered within the extended dates. Ulba paid GlobaLease on the original, not modified, schedule. T-M's initial delay did not excuse GlobaLease's performance obligation. GlobaLease breached by failing to make full payment to T-M.

Even if T-M's delay was a default for a period, it did not excuse GlobaLease's obligation to perform. "A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994) (citations omitted); *accord PAJ, Inc. v. Hanover Ins. Co.,* 243 S.W.3d 630, 633 (Tex. 2008); *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). "The non-breaching party must elect between two courses of action, either continuing performance or ceasing performance." *World Access Telecomms. Group, Inc. v. Statewide Calling, Inc.*, No. 03-05-00173-CV, 2006 WL 2986227, at *7 (Tex. App.–Austin 2006, no pet.) (citing *Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 756 (Tex.

App.–Houston [14th Dist.] 2004, pet. denied)).  "If the non-breaching party elects to treat the contract as continuing and insists the party in default continue its performance, the previous breach constitutes no excuse for nonperformance on the part of the party not in default, and the contract continues in force for the benefit of both parties."  *Id.* (citing *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982); *Gupta*, 140 S.W.3d at 756).  "When the terms of a contract are clear and unambiguous, and the facts concerning breach or performance are undisputed or conclusively established, the trial court decides, as a matter of law, whether the facts show performance or breach."  *Pala v. Maxim*, No. 01-01-00618-CV, 2002 WL 188567, at *4 (Tex. App.–Houston [1 Dist.] 2002, no pet.) (citation and footnote omitted).

In this case, neither the late delivery of furnaces nor T-M's failure to refund the conditional payments within 15 days of GlobaLease's demand excused GlobaLease's obligation to pay T-M the balance due on the furnaces.  Neither GlobaLease nor Ulba cancelled the contracts.  Both treated T-M's obligations to deliver the furnaces as continuing. *See World Access*, 2006 WL 2986227, at *7.  T-M continued work on manufacturing the furnaces and delivered them to Ulba.  T-M timely performed its obligations to Ulba by delivering within the modified contract dates.  Ulba timely performed its obligations to GlobaLease by making the lease payments to GlobaLease on the original timetable.  The record shows that, as a matter of law, GlobaLease sustained no damage as a result of what it identifies as T-M's failures to perform the contracts.

Because the contracts were not cancelled, the furnaces were delivered and accepted, and the lease payments were made to GlobaLease as set out in the original contracts,

15

GlobaLease is obligated to perform by paying the balance owed to T-M.  GlobaLease is not excused from performance by the delay in T-M's performance.  GlobaLease owes T-M the remaining $621,439 balance for the furnaces.

Nor is GlobaLease entitled to an offset as a result of T-M's delay in delivery or T-M's failure to return the previously paid conditional payments.  As noted, GlobaLease obtained the benefits from the original contracts because Ulba paid GlobaLease according to the original timetable, even after Ulba agreed that T-M's delivery dates would be extended. GlobaLease sustained no damages from T-M's failure to return the conditional payments with interest between November 2006, when payment was demanded, and December 2006, when T-M delivered the first furnace on a date that was agreed to as timely.  GlobaLease had no liability to Ulba from any delay in the delivery of the furnaces because the Lease Agreement expressly insulated GlobaLease from any harm due to the late delivery of the furnaces.  The "Terms of Payment for Equipment" section of the Lease Agreement between the parties stated that "[s]hould [T-M] fail to meet any obligations to [Ulba] under this Agreement or any other agreement, [Ulba] shall not have the right to make any claims against [GlobaLease]."  (Docket Entry No. 1, Ex. B at 4).  The "Other provisions" section stated that "[Ulba] and [T-M] Agree and affirm that any and all issues relating to the Equipment, Equipment condition, and/or Equipment delivery are issues solely between [Ulba] and [T-M] and any such issues shall have no effect on [Ulba]'s payment obligations to [GlobaLease] nor allow [Ulba] to delay, suspend, or reduce any payments due from [Ulba] to [GlobaLease]." (*Id.*, Ex. B at 6).  And GlobaLease was not damaged by either the initial delay in delivery or

T-M's failure to return the conditional payments because Ulba paid GlobaLease on the original payment schedule.

T-M's motion for summary judgment that it is entitled to recover the balance of the purchase price for the two furnaces is granted.

## III.   T-M's Application for a Writ of Garnishment

### A.   The Legal Standards

#### 1.   The Issuance of a Prejudgment Writ of Garnishment

"A garnishment suit is a purely statutory proceeding." *Liptak v. Richard E. Colgin I, Ltd*, No. 05-99-00583-CV, 2002 WL 1263981, at *3 (Tex. App.–Dallas June 7, 2002, pet. denied). "[T]he remedy of garnishment is summary and harsh, and should not be sustained unless there is strict compliance with the statutory requirements." *In re Texas American Exp., Inc.*, 190 S.W.3d 720, 725 (Tex. App.–Dallas 2005).  "By strict compliance with the garnishment statutes, a plaintiff in garnishment merely steps into the shoes of his debtor as against the garnishee, and may enforce, as against such garnishee, whatever rights the debtor could have enforced had such debtor been suing the garnishee directly." *Rowley v. Lake Area Nat. Bank*, 976 S.W.2d 715, 719 (Tex. App.–Houston [1 Dist.]1998, pet. denied) (citing *Beggs v. Fite*, 106 S.W.2d 1039, 1042 (1937); *San Felipe Nat'l Bank v. Caton*, 668 S.W.2d 804, 805 (Tex. App.–Houston [14th Dist.] 1984, no writ)).

Under § 63.001(2) of the Texas Civil Practice & Remedies Code, a plaintiff may obtain a prejudgment writ of garnishment if the plaintiff sues for a debt and makes an affidavit stating that: (A) the debt is just, due, and unpaid; (B) within the plaintiff's

knowledge, the defendant does not possess property in Texas subject to execution sufficient to satisfy the debt; and (C) the garnishment is not sought to injure the defendant or the garnishee.  *See also Liptak*, 2002 WL 1263981, at *3; *Swiderski v. Victoria Bank & Trust Co.*, 706 S.W.2d 676, 679 (Tex. App.–Corpus Christi 1986, writ ref'd n.r.e.).  "A writ of garnishment may be issued only when the demand is not contingent, is capable of ascertainment by the usual means of evidence, and does not rest in the discretion of the jury."  *In re Tex. Am. Express*, 190 S.W.3d 720, 725 (Tex. App.–Dallas 2005, no pet.) (citations omitted).  "When damages are unliquidated and in their nature uncertain, the demand is not subject to garnishment."  *Id.* (citations omitted).

### 2.  *Jurisdiction*

"[A] garnishment proceeding 'is operative in personam against the garnishee to prevent him from paying the debt to the garnishment debtor and is operative in rem upon the property of the defendant debtor in the hands of the garnishee.'"  *FG Hemisphere Assocs., LLC v. Republique du Congo*, 455 F.3d 575, 585 (5th Cir. 2006) (quoting *Matter of T.B. Westex Foods, Inc.*, 950 F.2d 1187, 1192 n.7 (5th Cir. 1992)).  "Thus, garnishment is a quasi in rem action in which 'the plaintiff seeks to apply what he concedes to be the property of the defendant to the satisfaction of a claim against him.'"  *Id.* (quoting *Shaffer v. Heitner*, 433 U.S. 186, 199 n.17, 212 n.38 (1977)).  "In garnishment cases, the court may exercise quasi in rem jurisdiction to the extent that it has jurisdiction 'over a person who is indebted to, or owes a duty to the defendant'" and there is "a connection between the garnished debt (or attached property) and the subject matter of the action."  *Stena Rederi AB v. Comision de*

*Contratos*, 923 F.2d 380, 391 & n.17 (5th Cir. 1991) (citations omitted); *see also Peterson v. Farrakhan*, No. 2:03 cv 319, 2008 WL 656267, at *4 (N.D. Ind. March 5, 2008) (citations omitted) ("There can be no doubt that jurisdiction over the garnishee is required.").

A federal court may exercise personal jurisdiction over a nonresident defendant if: (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) the exercise of such jurisdiction comports with due process under the Constitution. *See Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999). Because the Texas long-arm statute has been interpreted to extend as far as due process permits, the sole inquiry is whether the exercise of personal jurisdiction over a nonresident defendant comports with federal constitutional due process requirements. *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003).

Due process limits the exercise of personal jurisdiction over nonresident defendants to cases in which defendants purposefully establish "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  A court must determine  whether the defendant has established the requisite minimum contacts with the forum state and whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice.  *Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1205 (5th Cir. 1993) (citations omitted).

A court may assert personal jurisdiction under a theory of either "general" or "specific" personal jurisdiction.  A court exercises specific jurisdiction over a defendant if the cause of action alleged arises out of or is related to the defendant's contacts with the forum.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).  When a court exercises personal jurisdiction over a defendant in a case *not* arising out of or related to the defendant's contacts with the forum state, the court is exercising general jurisdiction over the defendant.  *Id.* at 414 n.9.

A court may exercise specific jurisdiction if: "(1) the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; and (2) the controversy arises out of or is related to the defendant[']s contacts with the forum state."  *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004).  The plaintiff must demonstrate a nexus between the nonresident defendant's contacts with the forum and the cause of action.  *Rittenhouse v. Mabry*, 832 F.2d 1380, 1390 (5th Cir. 1987).

When the cause of action does not arise from or relate to the foreign defendant's purposeful conduct within the forum state, due process requires that the foreign defendant have engaged in continuous and systematic contacts with the forum state before a court may exercise general personal jurisdiction.  *See Helicopteros*, 466 U.S. at 414–15; *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987) (citation omitted).  The plaintiff must demonstrate contacts of a more extensive quality and nature between the forum state and the defendant than those needed to support specific jurisdiction. *See Dalton v. R & W*

*Marine, Inc.*, 897 F.2d 1359, 1362 (5th Cir. 1990) (citations omitted). "To exercise general jurisdiction, the court must determine whether 'the contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction.'" *Holt Oil & Gas v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986) (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1191 (5th Cir. 1985) (citations omitted)).

### B. Analysis

T-M argues that it has satisfied the statutory requirements for the issuance of a prejudgment writ of garnishment, that this court has specific jurisdiction over the garnishees because Ulba and Kazkommersbank conducted business in the State of Texas, that the assignment documents do not show an absolute sale but rather the grant of a security interest, and that the writ should be issued against Ulba as well as Kazkommersbank because Ulba is the lessee  contractually obligated to make the lease payments.  T-M has submitted an affidavit by its president stating that GlobaLease owes T-M $621,439.00 for the furnaces; that, within his knowledge, GlobaLease does not possess property in Texas subject to execution sufficient to satisfy this debt; and that the garnishment is not sought to injure GlobaLease or the garnishee.  (Docket Entry No. 23, Ex. A).  GlobaLease responds that this court may not issue a writ of garnishment against Ulba or Kazkommersbank because they are not subject to personal jurisdiction in Texas, the lease payments are not owed to GlobaLease, and Ulba is not responsible for making the lease payments.  (Docket Entry No. 28).

21

T-M argues that this court has specific personal jurisdiction over Ulba and Kazkommersbank because the lease transaction was negotiated and closed with GlobaLease, a Texas company, with the involvement of a Texas branch of Wells Fargo.[2]  (Docket Entry No. 24 at 7).  GlobaLease argues that this court does not have personal jurisdiction over Ulba or Kazkommersbank because Ulba did not sign the Lease Agreement or Purchase Agreement in Texas, no representative of either company has ever been to Texas, the furnaces were manufactured in New Jersey and shipped directly to Kazakhstan, and the letter of credit was issued in Kazakhstan.  (Docket Entry No. 28 at 4).

The fact that the lease transaction was negotiated and closed with a Texas company and called for the lease payments to be deposited with a Texas bank is insufficient to show that Ulba or Kazkommersbank had "minimum contacts" with Texas.  "It is well established that 'merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction.'"  *Freudensprung*, 379 F.3d at 344 (quoting *Holt*, 801 F.2d at 778).  "[T]he combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant."  *Id.* (citing *Holt*, 801 F.2d at 778;  *Stuart v. Spademan*, 772 F.2d 1185, 1192–94 (5th Cir. 1985)).

---

[2]The Lease Agreement called for lease payments to be paid to GlobaLease's account with Wells Fargo Bank, N.A.  The Agreement lists Wells Fargo as being located in San Francisco, CA, not Texas. (Docket Entry No. 1, Ex. B at 8).

The fact that the Lease Agreement contains a choice-of-law provision specifying Texas law is not sufficient to support jurisdiction by this Texas court over the nonresident contracting parties.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985)); *Capstead Mortg. Corp. v. Sutter Mortg. Corp.*, No. 3:95-CV-2827-G, 1997 WL 135678, at *5 (N.D. Tex. March 12, 1997).  The Supreme Court has cautioned that "[n]othing in our cases . . . suggests that a choice-of-law provision should be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws' for jurisdictional purposes," but that "such a provision standing alone would be insufficient to confer jurisdiction."  *Burger King*, 471 U.S. at 482.

In *Burger King*, the Court found that a choice-of-law provision specifying the law of the forum state "reinforced" the nonresident defendant's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there" established by the nonresident defendant's "20-year interdependent relationship" with the plaintiff's headquarters in the forum state.  *Id.*  Citing *Burger King*, the court in *Capstead Mortgage Corp. v. Sutter Mortgage. Corp.*, 1997 WL 135678, at *5, stated that a choice-of-law provision "is not determinative of jurisdiction in the absence of other jurisdictionally significant contacts."  The *Capstead Mortgage* court found that the fact that one of the parties to a loan agreement was a Texas resident and that the agreement specified Texas law did not alone support jurisdiction over a nonresident party.  The court held that it had jurisdiction over the nonresident party because other facts showed that the nonresident party had purposefully established minimum contacts with Texas.  The agreement was signed in Texas;

23

the alleged injury occurred in Texas; the loan file and related documents were transported to Texas in connection with the transaction; and the agreement contemplated a continuing relationship between the parties in which the nonresident party was obligated to repurchase the servicing of the loan in the event that a misrepresentation or breach of warranty was committed, indemnify the resident party against losses sustained as a result of a misrepresentation or breach of warranty by the nonresident party, continue its commitments under the agreement notwithstanding its termination, provide proof of mortgage errors-and-omissions insurance and fidelity insurance to the resident party on request, and deliver audited financial statements each year to the resident party. *Id.*

The court reached a similar result in *Interfirst Bank Clifton v. Fernandez*, 844 F.2d 279, 283–84 (5th Cir. 1988), finding that a nonresident who had entered into a loan contract specifying Texas law was subject to the jurisdiction of a Texas court.  The purpose of the loan was to purchase a plane.  The court noted that "neither the loan agreement nor the choice-of-law clause independently supports Texas' specific jurisdiction over [the nonresident defendant]."  The court relied on a number of factors besides the Texas choice-of-law clause to support finding jurisdiction over the nonresident defendant: the defendant voluntarily agreed to finance the plane through a Texas bank; the defendant agreed to return the plane to Texas for sale; and, most significantly, the defendant signed a letter consenting to sale under Texas foreclosure procedures and agreeing to be liable for any deficiency between the sale price and the unpaid note.  *Id.; see also Marathon Metallic Bldg. Co. v. Mountain Empire Constr. Co.*, 653 F.2d 921, 923 (5th Cir. 1981) (finding that an expansive

guaranty containing an open-ended obligation which advanced credit over many months to a company identified on the face of the guaranty as located in "Houston, Texas," coupled with a Texas choice-of-law clause, created minimum contacts with Texas sufficient to establish specific jurisdiction over the nonresident defendant guarantors).

In this case, the only jurisdictionally significant contacts are that the Lessor, GlobaLease, was a Texas resident and the Lease Agreement contained a choice-of-law provision specifying Texas law.  The agreements for the sale and lease of the furnaces were negotiated and signed outside Texas.  The furnaces were manufactured in New Jersey and shipped directly to Kazakhstan.  Apart from making the lease payments, neither Ulba nor Kazkommersbank had ongoing obligations toward GlobaLease.  The record does not disclose that either Ulba or Kazkommersbank has "minimum contacts" with Texas sufficient for personal jurisdiction over them.  The application for a writ of garnishment is denied due to an insufficient record basis to show lack of personal jurisdiction over the garnishees.

**IV.    Conclusion**

T-M's application for a writ of garnishment is denied.  T-M's motion for summary judgment that it is entitled to recover the balance of the purchase price for the two furnaces is granted.

SIGNED on May 15, 2008, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge